UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------- x

BRUCE GOPLEN, Individually and On Behalf of      :
All Others Similarly Situated,                                    :    05 Civ. 0769 (CSH)
                                                                 :
                              Plaintiff,                          :    CONSOLIDATED CLASS ACTION
                                                                 :    (LEAD)
                  -against-                                       :
                                                                 :
51JOB, INC., DONALD LUCAS, RICK YAN,                             :
and KATHLEEN CHIEN,                                              :
                                                                 :
                              Defendants.                         :
----------------------------------------------------------------- x

FLOYD W. WEBSTER, KEITH WEBSTER,                                 :
KENT WEBSTER, AMIL DIPADOVA, and                                :
ROBERT WISTRAND, Individually and On                            :    05 Civ. 7527 (CSH)
Behalf of All Others Similarly Situated,                        :
                                                                 :    CONSOLIDATED WITH
                              Plaintiffs,                         :    05 Civ. 0769 (CSH)
                                                                 :
                  -against-                                       :
                                                                 :
51JOB, INC., RICK YAN, KATHLEEN CHIEN,                           :    MEMORANDUM OPINION
and DONALD LUCAS,                                               :    AND ORDER
                                                                 :
                              Defendants.                         :
----------------------------------------------------------------- x

HAIGHT, Senior District Judge:

In this securities fraud action, a purported class of shareholders in 51job, Inc. ("51job" or the

"Company") alleges that 51job and several of its high-level officers and directors — President and

CEO Rick Yan, CFO Kathleen Chien, and Chairman of the Board Donald Lucas --- made false and

misleading statements with respect to the company's revenues and expected growth, in violation of

§§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§

1

78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.[1]

Between January 21, 2005 and March 10, 2005, seven putative class actions alleging securities fraud were filed against the defendants. On July 26, 2005, this Court consolidated these actions and appointed Floyd W. Webster, Keith Webster, Kent Webster, Amil Dipadova, and Robert Wistrand (collectively, the "Webster Group") as Lead Plaintiffs. On August 25, 2005, the Webster Group filed its complaint.

Pursuant to Federal Rule of Civil Procedure 12(b)(6), defendants move to dismiss the complaint for failure to satisfy the heightened pleading requirements for securities fraud under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4.[2] For reasons set forth below, defendants' motion to dismiss is granted, with leave to plaintiffs to replead.

## I. BACKGROUND

### A. Plaintiffs' Factual Allegations

Plaintiffs' complaint alleges the following facts. 51job is a Shanghai-based provider of human resource services in China, with a focus on employee-recruitment and related services. Compl. ¶ 2.

_____

[1] The purported class is described as purchasers of 51job securities between November 4, 2004 and January 14, 2005 (the "Class Period") — excluding the defendants, officers and directors of 51job, and certain related individuals and entities. No class has yet been certified.

[2] The defendants' motion to dismiss and this Court's opinion address the sufficiency of the complaint filed by the Webster Group on August 25, 2005. This Court's order dated September 12, 2005 explains: "Defendants need only move against the complaint in the Webster Action and [] any decision with respect to the complaint in the Webster Action shall be applicable to all other complaints previously filed in the consolidated action." Order of September 12, 2005, at 2.

2

On September 28, 2004, 51job held its initial public offering ("IPO"). *Id.* The IPO was highly successful, as the Company was required to offer additional shares to cover over-allotments and the share price increased from $14 to $20.75 on the first day of trading. Compl. ¶¶ 2-3.

On November 4, 2004, 51job announced favorable financial results for the third quarter of 2004. Compl. ¶ 28. In a press release, defendants reported total revenues of RMB 135.0 million (US $16.3 million) and net revenues of RMB 128.1 million (US $15.5 million) in the third quarter of 2004.[3] *Id.* Revenues, net income, and gross margin had increased significantly over their levels in the third quarter of 2003. *Id.* Defendant Yan stated, "We believe that these third quarter results clearly demonstrate the soundness of our business plan and our execution capability." *Id.* The press release also reported fourth quarter performance projections: "For the fourth quarter of 2004, the Company estimates total revenues in the range of RMB 140 million to RMB 145 million and diluted earnings per share between RMB 0.42 and RMB 0.44." Compl. ¶ 29.

The price of 51job shares increased significantly in the period following the November 4, 2004 press release — from $28.29 on November 4, 2004 to a high of $55.37 during the Class Period. Compl. ¶ 31.

Before the market opened on January 18, 2005, 51job issued a press release announcing several negative developments. First, the Company's sales had declined in the latter part of December 2004. Compl. ¶ 32. Second, the Company lowered its guidance for the fourth quarter of 2004. Expected fourth quarter revenues were reduced from RMB 140 million to RMB 117-121 million, and expected fully diluted earnings per common share were reduced from RMB 0.42-0.44 to RMB 0.24-0.27. *Id.* Furthermore, 51job announced that its third quarter online recruitment

---

[3] The Renminbi ("RMB") is the official currency of the People's Republic of China.

3

services revenues needed to be revised. Due to a timing adjustment, approximately RMB 2-3 million of online recruitment services revenues originally reflected in the third quarter needed to be included in the fourth quarter. *Id.* The revised fourth quarter guidance incorporated this adjustment. *Id.* In addition, the Company announced that it had discontinued sale of stationery and other office supplies to business customers. *Id.*

Following the January 18, 2005 announcement, the price of 51job shares plummeted. Compl. ¶ 33. The share price fell from $43.82 on January 15, 2005 to $28.32 on January 18, 2005, the next trading day. *Id.* This decrease reflected a one-day drop of 35%, on unusually heavy trading volume of 7.4 million shares. *Id.*

## B.    Plaintiffs' Claims

In their first claim, plaintiffs allege that statements in the November 4, 2004 press release — regarding third quarter 2004 revenues and fourth quarter 2004 projections — violated § 10(b) of the Exchange Act and Rule 10b-5.[4] Plaintiffs assert that these statements were materially false and misleading because: (1) the Company "improperly recognized advertising revenue" and materially misstated revenues for the third quarter of 2004, (2) defendants "failed to disclose that the Company's business was experiencing a material downturn in advertising revenue," (3) the Company "failed to adjust its aggressively positive earnings announcements even in light of the sharp

---

[4] Plaintiffs' opposition brief to the motion to dismiss also seems to suggest that the Company's prospectus and its reported financial results for second quarter 2004 were false and misleading. Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss ("Pl. Opp."), at 3 ("[T]he Prospectus utilized to conduct [51job's] IPO contained materially false and misleading financial information."), 10 ("Plaintiffs have alleged with sufficient particularity that . . . 51job's 2Q04 . . . revenues and income were falsely reported . . . ."). But these allegations are not properly before the Court. The complaint makes no mention of these claims and plaintiffs cannot amend their complaint through a legal memorandum. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998).

4

downturn in business, which was well known to defendants," and (4) 51job's statements about the Company's "historical results and expected growth were lacking in any basis and deceived investors." Compl. ¶ 30. Plaintiffs assert that, due to defendants' high-level positions and access to information about the Company's finances, "defendants had actual knowledge of the misrepresentations and omissions of material facts . . ., or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them." Compl. ¶¶ 16, 45. Plaintiffs allege that the market price of 51job shares was artificially inflated by defendants' false and misleading statements, and that members of the putative plaintiff class suffered damages as a result. Compl. ¶¶ 46-48.

In their second claim, plaintiffs allege that the individual defendants, as controlling persons of 51job, are liable for their wrongful conduct under § 20(a) of the Exchange Act.

## II. STANDARD OF REVIEW

On a motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6), the district court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980); *see Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 124 (2d Cir. 1991). In reviewing a motion to dismiss, the district court must "take the well-pleaded factual allegations in the complaint as true," *Papasan v. Allain*, 478 U.S. 265, 283 (1986), and "draw[] all reasonable inferences in the plaintiffs' favor." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). The complaint may be dismissed under Rule 12(b)(6) "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

In reviewing a Rule 12(b)(6) motion, the court may consider the following materials: "(1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." *In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003) (citations omitted).

## III. ANALYSIS

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must "plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).

In addition, a claim for securities fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA. These requirements involve: (1) the particularity of the facts pleaded, and (2) scienter. Defendants contend that plaintiffs' complaint must be dismissed because it fails to satisfy these requirements.[5]

---

[5] Defendants also argue that plaintiffs' complaint should be dismissed because the third quarter revenue misstatement was not "material," and because the fourth quarter projections fall within the PSLRA safe harbor for forward-looking statements. As the motion to dismiss is granted for failure to satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA, I do not address these additional arguments for dismissal.

## A.    Particularity of the Facts Pleaded

### 1.    Legal Standard

When a complaint alleges fraud, Rule 9(b) requires that "the circumstances constituting fraud

. . . shall be stated with particularity." To satisfy Rule 9(b), a complaint alleging securities fraud

must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker,

(3) state where and when the statements were made, and (4) explain why the statements were

fraudulent." *Stevelman v. Alias Research, Inc.,* 174 F.3d 79, 84 (2d Cir. 1999) (citations and internal

quotation marks omitted).

Similarly, the PSLRA requires that "the complaint shall specify each statement alleged to

have been misleading, the reason or reasons why the statement is misleading, and, if an allegation

regarding the statement or omission is made on information and belief, the complaint shall state with

particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The Second Circuit

has concluded that this provision does not literally require "all facts" on which the belief has been

formed — rather, "plaintiffs need only plead with particularity *sufficient* facts to support those

beliefs." *Novak v. Kasaks,* 216 F.3d 300, 313-14 (2d Cir. 2000) (emphasis in original).

### 2.    Specifying the Allegedly Fraudulent Statements

As an initial matter, the defendants at bar argue that the complaint fails to identify which

particular statements are misleading. Defendants contend that the complaint reproduces passages

from the November 4, 2004 press release, followed by a list of reasons why the statements are

misleading, "without any clarification as to which rationale applies to any given statement in the

release." Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss ("Def.

Mem."), at 12. Defendants argue that this "scattershot" method of pleading fails to adequately

7

specify the allegedly misleading statements. I disagree.

Although the complaint includes several paragraphs from the November 4, 2004 press release, the listed reasons why the statements are misleading sufficiently indicate the particular statements at issue. First, the complaint clearly alleges that the reported third quarter revenues were false and misleading: "The Company improperly recognized advertising revenue, such that its real revenues in the third quarter were materially less than the RMB 135.0 million (US$16.3 million) in total revenues and RMB 128.1 million (US$15.5 million) [in net revenues] that the Company reported in its press release." Compl. ¶ 30. Second, the complaint states: "The Company failed to adjust its aggressively positive earnings announcements even in light of the sharp downturn in business, which was well known to defendants." *Id.* This statement sufficiently challenges the fourth quarter revenue and earnings projections in the press release as misleading. Third, the complaint states: "51job's Class Period statements about the Company's historical results and expected growth were lacking in any basis and deceived investors." *Id.* This contention indicates that statements regarding third quarter revenues or fourth quarter projections — including defendant Yan's statement regarding third quarter results ("[w]e believe that these third quarter results clearly demonstrate the soundness of our business plan and our execution capability") — were misleading.[6] Fourth, the complaint also alleges that "Defendants failed to disclose that the Company's business was experiencing a material downturn in advertising revenue." *Id.* This statement further indicates that the reported third quarter revenues and fourth quarter projections contained a misleading omission. Thus, the complaint sufficiently identifies the allegedly misleading statements and

---

[6] The complaint could have more clearly distinguished defendant Yan's statement from other statements quoted from the press release, but dismissal on this ground is not warranted. The stated reason gives a fair indication that Yan's statement was allegedly misleading.

omissions.

## 3. Particularity and Sufficiency of Facts Alleging Fraud

Defendants argue that the complaint "fails to allege a single fact – let alone 'all facts' – in support of plaintiffs' assertions" as to why the statements were fraudulent. Def. Mem. at 13. Defendants note that the complaint simply quotes from the November 4, 2004 and January 18, 2005 press releases without referencing any other documents or witnesses. *Id.*

As noted above, the Second Circuit has interpreted the PSLRA's "all facts" provision as requiring plaintiffs to "plead with particularity *sufficient* facts to support [their] beliefs" as to why the statements were misleading. *Novak*, 216 F.3d at 313-14. Similarly, Rule 9(b) requires plaintiffs to "explain why the statements were fraudulent." *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 84 (2d Cir. 1999). I analyze whether these requirements have been met for each of the allegedly misleading statements.

### (a) Reported Third Quarter Revenues

Plaintiffs allege that the third quarter revenues reported in the November 4, 2004 press release were false and misleading because they included overstated online recruitment advertising revenues. In support, plaintiffs cite the Company's January 18, 2005 press release, which acknowledges that "approximately RMB 2 million to RMB 3 million of online recruitment services revenues that were originally reflected in the third quarter [need] to be included in the fourth quarter." Compl. ¶ 32. On this basis, plaintiffs have pled with particularity sufficient facts to show that the reported third quarter revenues were "false" — in the sense that the November 4, 2004 press release did not accurately state the Company's third quarter revenues. But more is required to explain why the statement was fraudulent, rather than simply mistaken. *See In re JP Morgan Chase*

9

*Sec. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005) ("Plaintiff must allege facts indicating that the statements were false and misleading at the time they were made, because fraud cannot be pled by hindsight. . . . [P]laintiffs must supply some factual basis for the allegation that the defendants knew or should have known that the statements were false at some point during the time period alleged.") (quotations and citations omitted).

Plaintiffs assert that the defendants knew or should have known that the third quarter revenues were misstated.[7] The complaint alleges that defendants, due to their high-level positions in the Company, had access to adverse undisclosed financial information through internal corporate documents, meetings, and reports.[8] But plaintiffs do not support this allegation with any facts or details. Plaintiffs fail to identify any documents, meetings, or reports that show that the defendants knew or should have known that the third quarter revenues were misstated in the November 4, 2004 press release.

The Second Circuit has explained: "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000). In *San Leandro Emergency Med. Group Profit*

---

[7] Plaintiffs allege: "The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them." Compl. ¶ 45.

[8] Plaintiffs allege: "Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith." Compl. ¶ 16.

10

*Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir. 1996), the Second Circuit held that an "unsupported general claim of the existence of confidential company sales reports that revealed [a] larger decline in sales [than reported] is insufficient to survive a motion to dismiss." Rather, the plaintiff "needs to specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72-73 (2d Cir. 2001).[9] Plaintiffs clearly have not met this standard.

Plaintiffs' allegations that defendants knew or should have known that the reported third quarter revenues were false lack the particularity required by Rule 9(b) and the PSLRA. Moreover, plaintiffs have not provided "sufficient facts" to support their belief that the statement was fraudulent, as required by the PSLRA and *Novak*.

### (b) Defendant Yan's Statements Regarding Third Quarter Results

Plaintiffs allege that defendant Yan's statement regarding third quarter results — "[w]e believe that these third quarter results clearly demonstrate the soundness of our business plan and our execution capability" — was misleading. Because this allegation essentially hinges on whether the reported third quarter revenues were false and misleading, it also fails to satisfy the particularity and sufficiency requirements of Rule 9(b) and the PSLRA.

### (c) Omission Regarding Material Downturn in Advertising Revenue

Plaintiffs assert that the November 4, 2004 press release contained a misleading omission because "Defendants failed to disclose that the Company's business was experiencing a material

---

[9] This standard was satisfied, for example, where plaintiffs provided detailed information about the defendant's access to weekly and monthly data on book sales and returns, including "who prepared [these] internal company reports, how frequently the reports were prepared and who reviewed them." *Id.*

11

downturn in advertising revenue." Compl. ¶ 30. But plaintiffs fail to allege sufficient facts to support this assertion.

First, plaintiffs' allegations do not adequately demonstrate that a material downturn in advertising revenue actually existed at the time of the November 4, 2004 press release. The January 18, 2005 press release cited by plaintiffs states that the Company's third quarter online recruitment advertising revenue needed to be reduced by RMB 2-3 million. Compl. ¶ 32. This fact establishes that the third quarter advertising revenue was overstated. But it does not show a "downturn," or decline in advertising revenue over time. The complaint does not allege that actual advertising revenues in the third quarter of 2004 were less than those in the second quarter of 2004, or the third quarter of 2003.[10]

Plaintiffs have alleged that the Company's total revenues fell from about RMB 133 million in the third quarter of 2004 to about RMB 117-121 million in the fourth quarter[11] — which suggests that advertising revenues probably declined during this period. But there is no evidence that the downturn had begun by November 4, 2004. The January 18, 2004 press release cited by plaintiffs only states that sales slowed during "the latter part of the month of December." Compl. ¶ 32. Plaintiffs allege no facts showing that a material downturn in online advertising revenue existed at

---

[10] In fact, the November 4, 2004 press release states that online recruitment services revenues for the third quarter of 2004 were RMB 34.5 million, a 71% growth from RMB 20.2 million for the third quarter of 2003. Even if the reported third quarter 2004 revenues are reduced by RMB 3 million (the high end of the revision estimate), these revenues still increased by 56% from the third quarter of 2003.

[11] The November 4, 2004 press release reported third quarter total revenues of RMB 135 million. Compl. ¶ 28. The January 18, 2005 press release stated that third quarter revenues needed to be reduced by RMB 2-3 million, and projected fourth quarter total revenues of RMB 117-121 million. Compl. ¶ 32.

12

the time of the November 4, 2004 press release.

Second, even if plaintiffs had sufficiently alleged the existence of a material downturn in advertising revenue by November 4, 2004, the complaint fails to show that the defendants knew or should have known about it at that time. As noted above, the complaint alleges generally that defendants, due to their high-level positions in the Company, had access to adverse undisclosed financial information through internal corporate documents, meetings, and reports. Compl. ¶ 16. But these allegations are deficient because plaintiffs provide no facts or details in support; plaintiffs fail to identify any documents, meetings, or reports that show that defendants knew or should have known of a material downturn in advertising revenue at the time of the November 4, 2004 press release.

For these reasons, plaintiffs' allegation that the defendants fraudulently failed to disclose a material downturn in advertising revenue in the November 4, 2004 press release fails to satisfy the particularity and sufficiency requirements of Rule 9(b) and the PSLRA.

### (d)     Fourth Quarter Projections

Plaintiffs allege that the fourth quarter projections for earnings and revenues in the November 4, 2004 press release were false and misleading. In support, the complaint observes that these projections were significantly revised in the January 18, 2005 press release. Expected fourth quarter revenues were reduced from RMB 140-145 million to RMB 117-121 million, and expected fully diluted earnings per share were reduced from RMB 0.42-0.44 to RMB 0.24-0.27. Compl. ¶ 32.

But these factual allegations, without more, are insufficient because the Second Circuit does not recognize "fraud by hindsight." *See, e.g., Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) ("[M]isguided optimism is not a cause of action, and does not support an inference

13

of fraud. We have rejected the legitimacy of alleging 'fraud by hindsight.'"). "Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 84-85 (2d Cir. 1999) (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995)). *See also Novak v. Kasaks*, 216 F.3d 300, 309 (2d. Cir. 2000) ("allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud").

Plaintiffs must show that defendants knew or should have known that the fourth quarter projections were misleading when made. The complaint alleges: "The Company failed to adjust its aggressively positive earnings announcements even in light of the sharp downturn in business, which was well known to defendants." Compl. ¶ 30. For the same reasons that the complaint failed to adequately allege the existence of a "material downturn in advertising revenue" by November 4, 2004, plaintiffs have failed to show a "sharp downturn in business" by that date. But even assuming the existence of a sharp downturn at that time, plaintiffs fail to show that defendants knew or should have known about it. As noted above, the complaint alleges generally that defendants, due to their high-level positions in the Company, had access to adverse undisclosed financial information through internal corporate documents, meetings, and reports. Compl. ¶ 16. But these allegations are deficient because plaintiffs provide no facts or details in support; plaintiffs fail to identify any documents, meetings, or reports that show that defendants knew or should have known that the fourth quarter revenue and earnings projections were  misleading at the time of the November 4, 2004 press release.

As a result, plaintiffs' allegations that the fourth quarter projections for revenues and earnings

14

in the November 4, 2004 press release were  misleading fail to satisfy the particularity and
sufficiency requirements of Rule 9(b) and the PSLRA.

Although the complaint adequately identifies the allegedly misleading statements, the law
is concerned with *fraud*, not the inaccuracy of statements such as these; and the factual support
provided by the plaintiffs for each of their allegations of *fraud* fails to satisfy the particularity and
sufficiency requirements of Rule 9(b) and the PSLRA.

But even if these pleading requirements had been satisfied, plaintiffs would not make out a
case for securities fraud unless they adequately pleaded scienter, a question to which I now turn.

**B.     Scienter**

**1.     Legal Standard**

To state a claim for securities fraud under § 10(b) and Rule 10b-5, the complaint must allege
that the defendants acted with scienter — "an intent to deceive, manipulate, or defraud." *Kalnit v.
Eichler*, 264 F.3d 131, 138 (2d Cir. 2001). To plead scienter under Rule 9(b) and the PSLRA, the
complaint must allege facts that give rise to a strong inference of fraudulent intent.

Though Rule 9(b) states that "[m]alice, intent, knowledge, and other condition of mind of
a person may be averred generally," this provision "must not be mistaken for license to base claims
of fraud on speculation and conclusory allegations." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d
1124, 1128 (2d Cir. 1994). Rather, the Second Circuit has explained: "[T]o serve the purposes of
Rule 9(b), we require plaintiffs to allege facts that give rise to a strong inference of fraudulent
intent." *Id.*

The PSLRA essentially adopted the Second Circuit's "strong inference" standard for
securities fraud cases. *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000). The statute requires that

15

"the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2). The requisite state of mind in a securities fraud case is scienter, or fraudulent intent.

The Second Circuit has established that a strong inference of fraudulent intent "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir. 1995).[12]

---

[12] In *Novak*, the Second Circuit appeared to express some dissatisfaction with the *Acito* formulation: "Although litigants and lower courts need and should not employ or rely on magic words such as 'motive and opportunity,' we believe that our prior case law may be helpful in providing guidance as to how the 'strong inference' standard may be met." 216 F.3d at 311. As a seemingly alternative approach, *Novak* suggested that "the inference [of scienter] may arise when the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor. *Id.* (citations omitted). But subsequent Second Circuit decisions have employed the language of the two-pronged standard in *Acito,* including "motive and opportunity." *See, e.g., In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 74 (2d Cir. 2001)("Plaintiffs can plead scienter by (a) alleging facts demonstrating that defendants had both the motive and an opportunity to commit fraud or (b) otherwise alleging facts to show strong circumstantial evidence of defendants' conscious misbehavior or recklessness."); *Kalnit v. Eichler,* 264 F.3d 131, 138-39 (2d Cir. 2001); *In re Carter-Wallace, Inc. Sec. Litig.,* 220 F.3d 36, 39 (2d Cir. 2000); *Rothman v. Gregor,* 220 F.3d 81, 90 (2d Cir. 2000). In *Rothman,* the Second Circuit interpreted *Novak* in the following way: "As *Novak* explains, what is required when endeavoring to plead facts supporting a strong inference of scienter by showing motive and opportunity is not a bare invocation of magic words such as 'motive and opportunity' but an allegation of facts showing the type of particular circumstances that our case law has recognized will render motive and opportunity probative of a strong inference of scienter." 220 F.3d at 90. Thus, in analyzing scienter, I will use the *Acito* formulation and be guided by the manner in which that standard has been applied in Second Circuit cases.

16

## 2. Motive and Opportunity

As defendants have not contested their opportunity to commit the alleged fraud, the issue is whether plaintiffs have sufficiently pleaded motive. The Second Circuit has explained that motive "entail[s] concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994). "General allegations that the defendants acted in their economic self-interest are not enough." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000). In addition, "[m]otives that are generally possessed by most corporate directors and officers do not suffice." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).[13]

Plaintiffs argue that defendants' fraud was motivated by the desire to maximize proceeds from and to facilitate the success of 51job's September 28, 2004 IPO. Pl. Opp. at 20-21. But defendants' allegedly misleading statements were not made until November 4, 2004 — over a month *after* the Company's IPO.[14] Thus, this allegation of motive is plainly deficient.

Plaintiffs also argue that the individual defendants were motivated by a desire to increase their personal wealth because they owned, collectively, more than 19 million shares of 51job stock. Pl. Opp. at 21. But plaintiffs do not allege that the individual defendants actually sold any stock

---

[13] To illustrate this principle, the court noted: "Insufficient motives, we have held, can include (1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation. On the other hand, we have held motive sufficiently pleaded where plaintiff alleged that defendants misrepresented corporate performance to inflate stock prices while they sold their own shares." *Id.* (citations omitted).

[14] As explained above in note 4, any allegations of fraud related to 51job's prospectus for the IPO and the Company's reported financial results for second quarter 2004 are not properly before the Court at this time.

during the Class Period.[15]  Under Second Circuit case law, mere ownership of company stock is insufficient to show motive: "Absent some allegation [comparable to insider trading] to explain how a defendant benefits from an inflated stock price, stock ownership does not provide sufficient motive to sustain the pleading burden under Rule 9(b)."  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1131 (2d Cir. 1994).[16]  In *Acito,* 47 F.3d 47, the Second Circuit explained:

> Plaintiffs' allegation that defendants were motivated to defraud the public because an inflated stock price would increase their compensation is without merit.  If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.  Incentive compensation can hardly be the basis on which an allegation of fraud is predicated.

*Id.* at 54 (quotations and citations omitted).  Although *Acito* dealt specifically with executive compensation dependent upon stock value, these considerations apply equally to ownership of stock by executives.  Such allegations are "common to all corporate executives and, thus, too generalized to demonstrate scienter." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (citing *Shields*, 25 F.3d at 1130).

For these reasons, plaintiffs have not created a strong inference of fraudulent intent by alleging motive and opportunity.

---

[15] Instead, plaintiffs only note that, after the IPO, these shares "were registered and *could* be publicly sold." Pl. Opp. at 21 (emphasis added).

[16] *Cf. Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 85 (2d Cir.1999) (motive sufficiently pleaded by defendants' insider trading because "[t]he allegation supports the inference that [defendant] withheld disclosures that would depress his stock until he had profitably sold his shares"); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74-75 (2d Cir. 2001) (motive sufficiently alleged where defendant sold 80% of his stock holdings, for substantial profit, shortly after the allegedly fraudulent statements were made).

## 3. Circumstantial Evidence of Conscious Misbehavior or Recklessness

The Second Circuit has defined conscious misbehavior as "deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information, or knowing sale of a company's stock at an unwarranted discount." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (citations omitted). Recklessness has been defined as "conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* (citations omitted). The Second Circuit has explained: "Securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Id.*[17]

As noted above, the complaint alleges generally that defendants, due to their high-level positions in the Company, had access to adverse undisclosed financial information through internal corporate documents, meetings, and reports. Compl. ¶ 16. But these bare assertions, without any further facts or details, do not adequately demonstrate defendants' knowledge of facts or access to information contradicting their public statements. *See, e.g.*, *In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973, at *17 (S.D.N.Y. June 23, 2004) ("The Plaintiffs allege that the Defendants had access to adverse undisclosed information because of their senior positions with the company. Such

---

[17] As an example, the court noted that this "pleading standard was met where the plaintiffs alleged that the defendants made or authorized statements that sales to China would be 'an important new source of revenue' when they knew or should have known that Chinese import restrictions in place at the time would severely limit such sales." *Id.* (citing *Cosmas v. Hassett*, 886 F.2d 8, 12 (2d Cir.1989)).

19

allegations are insufficient to establish scienter."); *In re Health Mgmt. Sys., Inc. Sec. Litig.*, 1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998) ("courts have routinely rejected the attempt to plead scienter based on allegations that because of defendants' board membership and/or their executive managerial positions, they had access to information concerning the company's adverse financial outlook").

Plaintiffs argue that they have alleged scienter by circumstantial evidence in several additional ways. First, plaintiffs note that the third quarter financial results and fourth quarter projections in the November 4, 2004 press release were revised only about two months later in the January 18, 2005 press release. Plaintiffs argue that "[t]he shortness of time between certain of defendants' positive statements and the revelation of the adverse facts is also circumstantial evidence that these statements were false when made." Pl. Opp. at 22. But this inference is most compelling for problems of the "type and magnitude [that] likely develop over time, and do not become apparent to management all at once." *In re Grand Casinos, Inc. Sec. Litig.*, 988 F. Supp. 1273, 1283 (D. Minn. 1997). In this case, the magnitude of the third quarter revenue revision — a reduction of RMB 2-3 million out of online recruitment services revenues of RMB 34.5 million and total revenues of RMB 135.0 million — does not create a strong inference that defendants should have been aware of this issue two months earlier. The revisions to the November 4, 2004 fourth quarter projections were of much greater magnitude — expected fourth quarter revenues were reduced from RMB 140-145 million to RMB 117-121 million, and expected fully diluted earnings per share were reduced from RMB 0.42-0.44 to RMB 0.24-0.27. But the timing of these revisions is less suspicious given the type of data involved — financial results for the discrete fourth quarter period. It is not surprising that the Company would have a much better sense of its fourth quarter financial results in January, after the fourth quarter had ended, than it did in November, one month into the quarter.

20

Thus, the two-month period between the November 4, 2004 press release and the January 18, 2005 revisions does not provide strong circumstantial evidence of recklessness.

Second, plaintiffs allege that the Company's March 14, 2005 press release constituted circumstantial evidence of scienter because it included revised financial results for second quarter 2004, which had not been disclosed in the January 18, 2005 press release. Pl. Opp. at 23-24. As an initial matter, this allegation is not properly before the Court to show that the complaint adequately pleaded scienter. The complaint makes no mention of the March 14, 2005 press release, and "allegations made outside of the complaint [introduced by plaintiffs in their memorandum of law in opposition to motions to dismiss] are not properly before the court on a motion to dismiss." *In re Colonial Ltd. P'ship Litig.*, 854 F. Supp. 64, 79 (D. Conn. 1994). However, even if this allegation is considered, it does not create a strong inference of recklessness. That a revision to second quarter 2004 revenue was also made does not show that defendants knew or should have known facts contradicting their November 4, 2004 press release. Furthermore, the delay between the disclosure of revisions for third quarter 2004 and second quarter 2004 does not create an inference of fraudulent intent because plaintiffs have not adequately alleged that the two misstatements were discovered at the same time.

Third, plaintiffs argue that defendant Yan's signature on the Form 6-K filed with the SEC on November 4, 2004 supports an inference of scienter because "[d]efendants had an affirmative duty to monitor the Company's financial statements and public representations and their signatures represented to the public that they had done so." Pl. Opp. at 24-25 (citing *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 491 (S.D.N.Y. 2004)). But plaintiffs' invocation of *Atlas* is misplaced. *Atlas* explained that corporate officers, having signed SEC filings, "were not

21

entitled to make statements concerning the company's financial statements and ignore reasonably available data that would have indicated that those statements were materially false or misleading." *Id.* The *Atlas* court reviewed specific allegations of various reasonably available facts, or "red flags," that should have put the officers on notice that the company's planes were losing substantial value.[18] *Id.* at 491-92, 496. But facts raising comparable red flags have not been pleaded in the case at hand. That Yan signed the SEC filing — without specific allegations of reasonably available facts that should have put him on notice that the reported financial results were false — does not give rise to a strong inference of scienter.

For these reasons, plaintiffs have failed to create a strong inference of fraudulent intent through circumstantial evidence of conscious misbehavior or recklessness.

## C.   Control Person Liability

Plaintiffs assert a claim under § 20(a) of the Exchange Act against the individual defendants. To plead a claim under § 20(a), plaintiffs must show: "(1) a primary violation [of the Exchange Act] by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998). Because plaintiffs have failed to state a

---

[18] In particular, the plaintiffs in *Atlas* had alleged that: (1) in a trade publication, the company admitted that it had acquired certain planes immediately prior to a collapse in the market and thus was "paying far more than what the aircraft were worth"; (2) the company had been losing customers because the customers discovered it was more cost effective to acquire their own cargo planes; and (3) the company had indicated that a significant number of planes were idle due to lack of demand. *Id.* The court concluded that these specific factual allegations were sufficient to demonstrate that "signatories to the company's SEC filings containing its financial statements knew or should have known the planes were losing substantial value throughout the class period." *Id.*

22

claim for a primary violation of § 10(b) of the Exchange Act, their § 20(a) claim must be dismissed as well.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(6) and 9(b) is granted.

The Court grants plaintiffs leave, if so advised, to file and serve an amended complaint on or before October 30, 2006, if plaintiffs are able to so in a manner consistent with the provisions of Federal Rule of Civil Procedure 11.

Defendants are directed to answer an amended complaint, if one is served and filed, in the form and within the time specified by the Rules.

It is SO ORDERED.

Dated: New York, New York
      September 28, 2006

                        CHARLES S. HAIGHT, JR.
             SENIOR UNITED STATES DISTRICT JUDGE

23